Good morning, ladies and gentlemen. Our first case for this morning will be the Kansas City Southern Railway Company against the Sny Island Levee Drainage District. I might say it again. So, Mr. Brown. If it pleases the Court, Your Honors, I'm Paul Brown. I represent the appellants Kansas City Southern Railway Company and Norfolk Southern Railway Company. I see from the panel that you are all well acquainted with the parties to this lawsuit and with the federal statute that is to be construed on this appeal. This is an appeal by my clients, the railroads, from a judgment by the district court in favor of Sny Island Levee Drainage District in a bench-tried case. This lawsuit was brought by the railroads against the Sny Island seeking injunctive relief to prevent collection of a tax assessment by the Sny against the railroads on the grounds that the assessment violates the anti-tax discrimination provisions of the Railroad Rehabilitation and Regulatory Reform Act codified at 49 U.S.C. 11501B4. Your Honors, I want to say initially that this case involves an additional assessment. Since we were last here six years ago, the Sny never did go back and attempt to reassess the railroads in a non-discriminatory fashion with respect to the annual assessment. They have left in place for these six years an annual assessment that continues at the same rate it had been since we were last up here. And it applies to all properties in the district, and it's on the basis of a per acre allocation of the assessment. But they don't have to do that for the additional assessment. I gather there are these three types of assessments, right? The original, the annual, and the additional. Correct. And we're in the additional group, so they could do it by benefit, surely. They could, and I suspect the reason they have not done that is because they do not want to offend the major property owners in the district. The 90% of the properties that are the big farmers do not want to have to go back through the reassessment process. And I think the Sny concluded, and it's a conclusion that I made when I looked at it independently, although I've not had discussions with counsel about this, that they concluded that they would have to go through the entire reassessment process in order to assess the railroads on a benefits basis. In other words, if in fact the court admonished the Sny that they were to assess all parties in the district, if they were going to use a benefits basis, then all parties, all landowners, had to be assessed on a benefits basis. And that's a process they simply did not want to go through. So let me cut to the chase. The district court, of course, issues this huge opinion using maybe one of the worst fonts I've ever seen in my life. I agree, Your Honor. But putting that to one side makes a lot of findings of fact about methodologies. I mean, there are competing methodologies. Doesn't think the methodology that your experts used was as well accepted and as sound as the methodology that the Sny Island experts used. And your opponents say the burden of proof, meaning the burden of persuasion ultimately, is on you. So how is it that we get from this very thorough and careful opinion to ruling for you? There are two things that I have to convince this court of in order to prevail in this appeal. First of all, that in fact the court's findings support as a matter of law a finding of discrimination against the railroads. And I'll talk about that in just a second. Second, I must convince this court that although my clients have the burden of proof of proving discrimination, that the burden then rests upon the taxing authority, the Sny, to prove a justification for that discrimination. And in this case, that justification is, oh, it's okay that we've discriminated against the railroads on a per acre basis, the basis that we've done for over a hundred years, because we have sat down and figured out what the benefits that the railroads and everybody else in the district gets from the levies, and we have allocated this additional assessment on the basis proportionate to the benefits received. Which would be a non-discriminatory basis, you would agree. If you thought that they had nailed the benefits properly, they can do that, can't they? I agree, Your Honor. They can do that. The Four R's Act does not prevent them from using such a methodology, provided that it is not discriminatory. Now, in this case, and I would like to point out that Mr. Klinger, the lead engineer that prepared the benefits analysis, put in his report, that's Exhibit D-2, put in his report that this benefits analysis can be used for the additional assessment and the annual assessments. I think it's very clear that if the Sny prevails here today in this appeal, that they will then go back and do a reassessment of the annual assessment, not only have the additional assessment, but redo the annual assessment using the same methodology and using essentially the same tax rate. The railroads will end up proportionately paying this higher tax rate. What many of the methodologies the 3KA engineers used were derived from the Army Corps, from FEMA, from industry practice, and to the extent the engineers deviated from that practice or created their own methodology, does that speak, doesn't that really go to weight more than admissibility? In some respects, it does. On the other hand, with respect to the ability, the key, and the district court put this in its findings, the key was determined what the, excuse me, I left something at the table. The key to this was whether the Sny could determine what the benefits were without levies. And that meant somebody had to have the ability to say, well, what kind of damage would the railroads have if there were no levies? But why is that the right question? That itself is a tact, because the levies have been around, for better or for worse, for 100 years or so, for a very, very long time. And I gather that one of the debates is, is the proper analysis levy versus no levy, or is the proper analysis levy breach versus no breach? Those are two different questions, I believe. Your Honor, Sny tried to make that an issue in the district court, and the district court accepted that. It made no sense. We have an affidavit that Mr. Klingner filed where he said, my benefits analysis is on the basis of what damages would occur if there were no levies. Now, it didn't have to do with whether there were no levies permanently. It was as if, as my expert said, Dr. Pinter, if the levies are magically removed. But I don't get that, because if no one had ever, from the beginning of time, built levies on the Mississippi, then when there was a huge flood, the water would spread very evenly across agricultural land, depending on elevations and topography and the like. But it's going to spread much further. Once you have a levy and there's a breach in a particular area, it just makes sense that the water's going to behave very differently. It's going to come rushing through, and there's going to be much more velocity to it. It's a really different question, I think, levy versus no levy on the one side, or breach versus no breach on the other side. And, Your Honor, interestingly, it was Mr. Klingner and the Sny that said, oh, there's no difference between what happens if there are no levies there, and if there's a breach of the levy. Now, Sny has attempted to argue to the district court that they were analyzing a levy breach situation. They made this reference that if the levy was removed through a particular cross-section, if the court will read the record very closely, you'll see that Mr. Klingner said, as if all of the Sny's levies were removed, and all the levies upstream and downstream, that is from other levy districts, were left in place. And the district court was frankly confused by that, and they were confused because, quite frankly, the Sny was desperately trying to overcome the challenges we had to their methodology, and one way to do it is say, Dr. Pinter did it wrong because he removed the levies, and we simply duplicated a levy breach. They did not. They did exactly what Dr. Pinter did, and there is one place in the record where, and it's referenced in the brief, where Mr. Klingner is asked that question, and he said, it's as if the Sny's levies were removed, and the levies upstream and downstream were left in place. But, Your Honor, we really don't need to address that issue for my client to prevail, because I have to show, I have to convince this court that there was discrimination, and I've got to convince this court what the appropriate comparative class is, and if I can't do that, I don't win on this appeal, and I'd like to address first the comparative class. Go for it. The CSX2, the Supreme Court's most recent pronouncement on the 4R's Act case, decided about 13 months ago, makes it very clear that there's two things that a plaintiff in a 4R's Act case has to show in order to establish what the comparative class is, and I think there's no question that the standard on review is it's an issue of law, so this court decides that question de novo. It's an interpretation of the statute, and every case that has decided comparative class issues have decided that de novo. In fact, this court did that last time we were up here. The court said two things that the plaintiff has to prove. First of all, it has to prove what is, it says the comparative class should be based, it can be anything, and it should be based upon what the plaintiff's claim is in the particular lawsuit, and in this lawsuit, our claim is based upon the fact that we were discriminated against on a per acre basis, and that the appropriate comparative class is to compare all landowners in the district on a per acre basis with the railroads. Has a court ever employed that kind of universal approach you're advocating when analyzing a 4R Act claim? I have never seen a case that's done that. However, I think it's very clear that it can be done, that the Supreme Court said in CSX 2, the term that's the oyster analogy. Now, why is that the appropriate case? So the second thing that we have to show is that the parties are similarly situated, and it's very clear in this case that the railroads are... But can I interrupt you for a minute? Because back on this CSX 2 business, we're dealing with a B4 situation, right? Or at least you say we are. A B4, yes. Imposing another tax that discriminates against a rail carrier, and it seems to be separate from the other three that are all talking about ad valorem taxes exceeding tax rates that mention commercial or industrial. Yes. But what I'm not sure I see in CSX 2 is a compulsion to use everything, as opposed to just saying use something that makes sense for the purpose that we are pursuing here. And I would say it's more than what makes sense. What is right? What is accurate? And the court said where a party brings a claim alleging discrimination, the first thing the court needs to look at is what is that claim? What is the claim that's being made? And here the claim that the railroads are making and have made consistently is that we've been discriminated on a per acre basis. But actually though, if... And I don't know that CSX 2 speaks to this, but if you're talking about benefits, it makes sense that agricultural land would be benefited in a certain way, and maybe pipeline utilities or residential property or railroads, for that matter, that it's not automatically the case that the benefit is going to be exactly the same for each type of use. That's correct. And actually the benefit is the same, it's measured a little bit differently. So in the case of the railroads, it's measured in terms of... Say again? The benefit is the same, that is protection from floods. Right. But it's measured a little differently depending on the type of... Monetized benefit though, you can say at a very high level of generality, protection from the floods, but for a farmer that might be extremely valuable, for a railroad it might be partially valuable because you've already got the embankments and maybe the tracks don't wash away as quickly as they think it might or whatever. But I'm not sure that the monetized value is going to be the same for each use. Well, there's no question about that, and that's where the experts came in. Right. But as I say, in this case, the railroads can prove discrimination by saying, look at the way it's been done for 100 years. Look at the way the SNI is still doing it for all other taxpayers with respect to the annual assessments. Look at the fact that... But now we have the commercial and industrial people getting the same treatment you are getting, don't we? Yes, and that's an inadequate class, and I can tell you very easily why it is an inadequate class. There are a mere 28 properties in the district that are called, other than the railroads and the pipelines and the utilities, that are classified as other industrial and commercial properties. They have 51 acres out of 114,000 acres. That works out to 0.04%, not even a half of 1%, of a tenth of a percent. The railroads comprise about three-tenths of all the land in the district. So together, railroads and industrial properties, other industrial and commercial properties, consist of about a third of a percent of all the land in the district. That's not a group that's sufficient to politically protect themselves from the big farmers. Well, how are the railroads similarly situated to then take the rest of the property owners, residential property owners, who say, for example, own a vacant lot that's less than an acre in size? I don't understand how you get yourself there either. And the court points out that we have to show that the railroads are similarly situated to the other taxpayers in the class that they wish to be compared to, and that would include residential, that would include other industrial and commercial, include farmers. How are they similarly situated? They're similarly situated because the tax at issue supports the operation and maintenance of the SNI's levies. All other lands in the district, as well as the railroads, receive flood protection from the SNI's levies. All other lands in the district, as well as the railroads, pay the tax at issue. Now, SNI contends that all lands in the district, as well as the railroads, are assessed in the same manner and are subject to the same tax rate. That's the SNI's argument, and that proves that we're similarly situated. You're in your rebuttal time, you know, but go ahead. Thank you, Your Honor. I will continue because there are a couple of other important points I would like to make before I sit down. And one is, it's the district court's own findings that proves discrimination if the comparative class is all other lands in the district. And I will concede that if it's just other commercial and industrial properties, although this is not clear from the record, I can't prevail in this case. My clients can't prevail. The court will recall that Mr. Powell, one of the engineers that worked on the benefits analysis, did all this work, and the court will recall that we pulled out his spreadsheets and we looked inside the cells. We didn't take just the piece of paper and we saw where he was manipulating the numbers. He put all kinds of unit values in. He had no documentation to show how he came up with those numbers. And then even then, the number produced by his spreadsheet, he applied a 75% discount. Why did he do that? And I think I know the answer. To equalize the railroads to the other commercial and industrial properties. Taking that 75% discount to the railroads brought the railroads into the same range on a per acre basis as other commercial and industrial properties. And that's why he did it, and that's why I cannot prove discrimination if the comparison class is other industrial properties. But I submit that under CSX-2, the proper comparative class is based upon what our allegations of discrimination are and based upon our proof of the similarity. We're all taxed. We're taxed for the same reason, flood benefits. And the SNI contends they use the same methodology with all properties, even if it's measured a little differently for different types of properties. So that's the issue of comparative class. What is the facts and the district court's opinion that prove discrimination on a per acre basis? And that is that the court found in its opinion that .3% of the property in the district is owned by the railroads, yet the railroads are paying 6% of the assessment. The court also made a finding regarding the amount of the tax the railroads would pay if they were assessed on a per acre basis rather than assessed on a benefits basis. And when I say that, I mean when the assessment is allocated on a per benefits basis per the SNI versus on a per acre basis. And we see that the SNI's assessment on a per acre basis would be $23,213 versus when it's allocated on the basis of the benefits that the SNI came up with, it's $91,084. That's a four-fold disparity. Likewise, the Norfolk Southern, their assessment on a per acre basis is $15,877 compared to $102,976 when it's allocated based upon the SNI benefits analysis. That's a seven-fold disparity. When we look at the comparison of the railroads, the tax they are paying versus the amount of land they have, that's a 20-fold disparity. Those are facts that are in the court's findings of fact, and that shows as a matter of law that there was discrimination. Let me say very briefly, the SNI is entitled to justify that discrimination by proving that they accurately allocated the benefits, and they did not because the district court made no finding that the SNI accurately did that. The only finding that the district court made with respect to what the SNI did on their benefits analysis is to say they attempted to do it and that it may be impossible to do it. And in fact, we know it's impossible to do it. Mr. Powell, I asked him the question in his deposition at trial, you don't know what kind of damage a railroad embankment sustains from flooding in that situation. I'm talking about the situation in an unleavied floodplain where the water comes up over the river embankment without cresting or breaching a levee. Answer, I don't think anybody knows. Okay. Thank you very much, Mr. Brown. Ms. Sandifer. May it please the court, Joanne Sandifer. I am representing the Sny Island Levy and Drainage District today. So here is my question for you. It's disturbing reading the district court's opinion to see the number of times the court says things to the effect of, well, it's really hard to tell and you have to speculate some or you have to engage in guesswork or you have to do all of these things. Against the backdrop of a statute that very clearly has the purpose of making sure that out-of-county or out-of-area entities are not paying more than their fair share, and I'm looking at these four different categories under the 4R Act, and number four is very broad-based. As the Supreme Court itself said, impose another tax that discriminates against a rail carrier providing transportation. And so it seems that even if you're on a benefit basis, if the agricultural land in a district is benefiting proportionally more than rail land or commercial land or pipeline land or whatever else kind of land you want, then that's prohibited by Part 4. Your Honor, to address that question, I understand the court's concern about some of the district court's comments, and I believe those reflect the fact that the district court sat through three weeks of extremely complex expert testimony. I understand that, but we're here to review it. He wrote a very detailed opinion, but there are critical points where people seem to just pull numbers out of the air, like this 75% number or in the building remodeling, adding 30% for the value back. I don't know where that comes from. Well, Your Honor, actually that was explained very carefully to the district court. And if I could back up and talk to the court about the agricultural, I want to just make that discussion in terms of the court's concern about the subsection before. And while it is broader, the other sections contain this challenge is actually, I think, quite similar to the type of challenge addressed in the CSX versus Georgia case. It's very similar to a case where somebody is challenging the determination of fair market value for tax purposes under B3. But you have to grant me that there's some differences in what the various subdivisions that we're looking at address. So the first one seems to be hooked into the market value of the rail transportation property and the ratio with the assessed value of other commercial and industrial property. Okay, fine. Market value. And then two just fills out a little bit more of one. One of them is assessment. One of them is levying or taxing. So I see they're about the same. Three also looks at ad valorem property tax compared to commercial industrial. And then all of a sudden you get to four, which the Supreme Court itself observes, you know, doesn't have that limitation. So presumably Congress didn't want it in there. The purpose of the Act, obviously, is to prevent discrimination against railroads. Right. And so we've got commercial and industrial singled out for one, two, and three, but it's not there in four, and the Supreme Court said so. It's not there in four. And I believe, though, and we've briefed this issue, that under the ACF case, and this Court recognized this in its prior case, the appropriate comparison class for property tax challenges excludes agricultural property. And because this is a property tax challenge, while we admit it's under subsection four, it's not under the first three subsections, we believe the same rationale applies. But why should it in the wake of, I mean, this is a different case from the earlier ones. You yourselves have argued very strongly that you started from scratch and you did all this work, to which I say fine. You know, that's the new set of facts that we have before us, but it also means that what we said in the previous case about proper comparisons may not have any bearing anymore, both because of what you did and because of what the Supreme Court has done. Well, I think the Supreme Court has said that the comparison class is not necessarily limited to commercial and industrial properties. They did. And we can see that. I believe, as a legal matter, that based upon this Court's prior interpretation under the ACF and CFF cases, the agricultural should still be excluded. Why? Because it gets no benefit from levies? No, because the – Probably gets more benefit from levies than the railroads. Well, I'll discuss that, but because the legislature has indicated in the first three subsections that the states can trick agricultural property for property tax purposes, and because this is at heart a property tax, I believe that holds. But, Your Honor – But why should it? I mean, why does it – aren't you reading into part four something that's not there? Well, that's exactly what the Supreme Court did in the ACF case. But I'd like to even go further. Setting that aside, you don't have to decide that issue. Let's stick with the similarly situated. This Court, the CSX case, said you've got to compare to similarly situated properties. The district court found, as a matter of fact, that the commercial and industrial properties were the only similarly situated properties. But didn't the district court feel compelled – I mean, he cites our earlier decision and similarly situated always has to be with respect to what? And in this instance, it's who's going to bear a tax burden to pay for these levies. Nobody is thinking the levies are going to be dismantled tomorrow, and that's a point that I thought was important on the other side. And I agree, Your Honor, but similarly situated deals with benefit, and you have raised the issue. Are these properties benefited differently? They absolutely are. The nature of the property makes the benefit very different. In fact, agricultural property is benefited in a much different way. If there's a flood, the farmers lose a crop. The next year, the fields dry off and they replant it. But the thing about that is, though, for that year, they do lose the crop. They do lose the crop. The land is completely ruined for a year. I'm sorry. I did not mean to interrupt. They do lose the crop, and that's exactly how our experts determine the benefit to the agricultural property, by looking at that crop loss. When they assumed that people were off there carting everything out of their house, they excluded the contents of structures, and I just didn't see any evidence about that. I was thinking to myself, well, maybe you could look at evidence of insurance claims, who's claiming for structural damage and who's claiming for contents damage, whether it's commercial property or farm structures or the like. But there's nothing. People are just pulling this out of their heads. Well, they did not pull it out of their heads at all, Your Honor. We had very sophisticated. We hired the premier hydraulic engineering firm in the Midwest. Why does that tell you about whether farmers are filing claims for structures or not? Because they understand what they had to do was estimate the amount of damages to all of these different types of properties in hypothetical flood events from a levee breach at different elevations and the kind of damages that occur. And they had extensive databases to review the type of damage that occurred in other flood events, to estimate replacement costs, and they testified without equivocation that when you're looking at agricultural property, the driver of benefit is the loss of the crops. Structures is basically irrelevant. The contents, there was undisputed testimony that everybody, that took two days for the Snye levee to fill in 1993. Everybody had time to move personal property, and the railroads did too. We did not assess the railroads for loss of their cars or contents. It was their track and the things that couldn't be moved. But you did take into account the Norfolk's damages from the 93 flood but not KC's lack of damages from that flood. You assumed everybody was going to be the worst-case scenario. Only in the event of a levee breach. So in other words, we did for both railroads. But the 93 flood was the point of reference for everybody, and the Norfolk didn't have, or sorry, KC didn't have any damages. KC didn't have any, and that was critical to our experts' determination because, again, we're looking at the benefit for the levee holding. The levee holds, zero, zero damage, right, just like Kansas City Southern had. What the 93 flood demonstrates is that when the levee breaches, there is a potential for $3 million of damages to the Norfolk, no, sorry, $5 million of damages to the Norfolk Southern with the track swinging in the air from culverts and embankment and siding and rail track wiped out. It's $9 million, our experts said, in today's dollars. The difference is the key, Your Honor. We're looking at and measuring the benefit for the levee's holding, and that's exactly what Mr. Klinger did despite what Mr. Brown has testified to, and this is really an issue of fact. And the evidence, Mr. Klinger's testimony was clear. He looked at the potential for a breach at one particular location, one particular cross-section, whereas Dr. Pinter, the railroads experts assumed the levees were gone permanently. You have to look at what the assessment's for to determine what the benefit is, right? So in this case, the assessment was for repairs and maintenance to keep the levees in place, to prevent a breach, to prevent the 93 damages. That's exactly what our experts did. Can I ask you about this calculation, though? You calculated the annual benefit for the railroads, and the engineers reduced the calculation by 75%. Yes, Your Honor. So when a reduction is this large, it wasn't based on industry practice, right? I mean, doesn't it suggest that the calculations were not reliable? No, Your Honor, and let me address that because it was one point in a very major overall calculation done by our experts. And there is no dispute that there is a large degree of professional judgment, and that's what the Court was referring to when it talked about the difficulty. When you're determining benefits to property from hypothetical flood events, there is an element of professional judgment that comes into play. Now, when the engineers did their calculations of potential damages at the various flood depths for the railroad, they used the evidence from the 93 flood, they used their own cost estimates, they used their own in-house data they have regarding different floods and railroad damages, and they came up with some numbers. And before putting those numbers into their complex computer manual that did the statistical analysis to spit out the different estimated annual benefit, the engineer determined to reduce it 75%. And his testimony on that was very clear. He said, I wanted to be 100% certain. I wanted to go with what I thought was the absolute baseline, the most conservative number. But why do we have to believe that? If it's not based on an industry standard. See, I understand how he did it all, but how did he come to that? I understand he put everything in the computer and it spit it out and he reduced it, but it's the basis of the 75% reduction that I'm questioning. It's professional judgment, and at some point, that's what you have to rely on in these situations. But it wasn't professional judgment, or it's jiggering the numbers to come up with the bottom line that he wants. But it's in favor. How could that possibly discriminate against the railroads? What it suggests is that the input numbers that are too high by a factor of four are not reliable numbers themselves. This is around page 47 of the district court's opinion. He plays around with it and he plays around with it. He doesn't have extensive notes or spreadsheets to show how he calculates flood damage. He doesn't document unit values that he puts into the spreadsheet. He looks at the number he comes up with and he says, ah, that's too high, and he plays with it until it gets down to something he's comfortable with. But that's the number that you want. So it's like, give me the answer and then I'll tell you what the question is. Your Honor, that's not how the testimony played out, and that is not what the experts testified to. It's what the district court said, though. The district court is describing some of the testimony. They're describing everything. Ultimately, the district court found that methodology reasonable because not only did he come up with this number, and there's no evidence that that was the number he wanted. Well, it says Powell did not recall and has no record of the figures he used before deciding to use 25% of the original amount. He acknowledges that there's a lot of uncertainty, da-da-da, you know. He did what the district court says. And I understand. And Mr. Powell testified that at all times he knew he was going to reduce the number between 20% and 30% and he settled on 25%. And he did it, he testified, to be conservative. He did not just pick a number out of the air. But he doesn't do that with, I mean, like regularly, if there's a property assessment and a tax assessor goes out and figures out the fair market value of all the property in a taxing district, then sometimes they'll tax people on the basis of, you know, 30% of the assessed value or something. But it's uniform. It's across many different kinds of property. This is, you know, everybody else has one rule and the railroads are over here and they've come up with this other number. Well, Your Honor, just if I could. One of the differences for the other, all the other types of properties, there are published debt damage curves that the KA engineers used. Frankly, so did the railroad engineers. For the railroads, there are no published debt damage curves. There's nothing out there saying when you have a 100-year flood, a railroad's going to have X amount of damages over history. Well, because there was testimony saying there are more factors than just the depth. People were talking about whether there's a bridge or whether there's a culvert or whether it's one side or whether it's two sides. And that's why it comes down to professional judgment. Both parties had to create, for the railroads, their own debt damage curves. That was unique for the railroads. Both parties had to do that. There were not published curves. But this was the only property for which he had to do this. So the 75% reduction wouldn't have been applicable to the others. He had published debt damage curves. His data is terrible is what this means on what the actual damages are because if he's got to suddenly reduce it by 75%, he's got an unreliable number. Well, I beg to differ, Your Honor. I don't believe he said he wasn't comfortable with the number. I believe he said he wanted to be conservative. And there's nothing wrong with that. And then the two other experts, after he got his number, Mr. Klinger and Mr. Risley did an extensive check on that number, on the number that had already been reduced by 75%. They used various other methodologies to determine whether or not that was an accurate number. It's no different than what the railroads. The railroads engineers came up with their own numbers. They used nothing but professional judgment as well. Well, they had experience as well. How much have we actually paid to do this kind of work? And we had that data as well. We had the actual data of what they paid. What they didn't have, Your Honor, was someone who had ever attempted to estimate damages in a hypothetical flood event. In other words, to estimate how much. Why is hypothetical better than real? Because that was their task here. There's only been one real flood in this 400-foot flood. What these experts on both sides had to do was determine how much flooding would occur and what type of damage would occur in a 100-year flood. You mean 400-foot flood. You mean 400 years? 400-year flood. Yeah, right. So there would be a 2-year flood, a 5-year flood, a 100-year flood. Those are all hypothetical situations they had to estimate damages from. Their expert admitted he had no hydraulic experience, and he had never before attempted to determine potential damages. But the other expert had the hydraulic experience. They were working as a team. Their other expert was a geologist, Your Honor. He had absolutely no hydraulic expertise at all, and he has been criticized by the Corps and the regulatory authorities consistently for his lack of expertise in the area. And, in fact, the district court went back and carefully reviewed the methodology and the credentials of all the experts and critiqued their railroad expert for his lack. Found significant was the word the court used. Found significant the lack of expertise he had in determining damages to railroads. So what the district court did, eventually, was determine which of the experts were more credible and which methodology was more credible. And the district court recognized. I'm going to quote. It is significant that, when possible, the district has utilized methods which have been approved by the agencies which inspect and maintain the levees and ensure compliance with applicable standards. At times, the members of the KA team exercised professional engineering judgment if there was non-applicable program or industry practice, and that would be applicable to the 75% reduction we've talked about. The court went on and said, The court finds that to be a reasonable approach. The engineers and other witnesses were generally credible in discussing this process. That's at page 83. And that's in page 84. And that's really what this case comes down to. It's an expert case, Your Honor. It's an issue of fact. Determination of benefits is an issue of fact. Now, do you agree that if we were to disagree with you on the relevant set of comparisons, that these numbers would then look discriminatory? No. So we took into account all of the land in the district? Not at all, Your Honor. The parties presented their methodology and their determinations with respect to every single category of property both parties did. Our experts determined the benefits for the agricultural and the other categories of properties and used the same bathing methodology to do so and charged those properties the exact same percentage, the 25% of their benefit. So even considering all of the properties in the district, the evidence clearly supports that there was a proportionate spreading of the benefit across all properties. And the same deficiencies that undermine the railroad's evidence with respect to the commercial industrial properties would similarly hold for the other properties as well. In other words, they could not meet their burden of proving discrimination because, as the district court found, their evidence wasn't reliable and they measured the wrong benefit. So even if you considered all the properties, we submit the result would be exactly the same. And I want to talk a minute about the issue of what is discrimination here. Mr. Brown has said repeatedly that because he can show a per acre difference, there is discrimination. But as this court, I believe, has already acknowledged today, the issue in this case is not a per acre difference because the issue in this case is a benefit assessment, and the Illinois courts have made that clear. An assessment under this code must be based on the benefits reaped from the particular assessment at issue, in this case, an assessment to repair and maintain the levees. So the issue is whether or not there was any disproportionate assessment only relative to benefit. Per acre is essentially meaningless. In fact, the evidence in this case shows that on a per acre basis, the railroads have much greater benefit. The experts, our experts, determined that to recreate the railroad's property in the district would cost some $44 million from the Norfolk 7 and 37. But that assumes it all washes away, and there's no evidence to suggest that's going to happen. Your Honor, I beg your defer that. Only 25% of our experts only determined 25%, and that's more than supported by the record, of the railroad would wash away in the maximum 400-year flood, and the others assumed less. But there's no evidence at all that that kind of damage would occur. There was, Your Honor. They based that on the evidence of the 1993 flood and their experience in judgment and their evidence of other flood situations. Experience in judgment, yeah. I mean, if I stand up there and say, well, I have experience in judgment, usually under 702, under our standards, you've got to back it up. Well, Your Honor, I believe the experts did, and they had more than their experience in judgment. They had a lot of data. There are hundreds of exhibits that were submitted to this court, including all the data from the 1993 flood in the Norfolk 7. So to conclude, I believe this court has done exactly, or the SNI has done exactly what this court instructed it to do when we were here before. It has corrected the mistakes this court previously identified. It hired a professional engineering firm, and it applied a uniform methodology to determine the benefits to all the properties in the district. The district court found, as a matter of fact, not just no discriminatory intent, but also no discriminatory impact, and those factual findings are not clearly erroneous. For that reason, we ask this court to affirm. Thank you. Okay. Thank you very much. I think you actually ran out of time, Mr. Brown, but if you can restrict yourself to one minute, I'll let you respond. The point that I would like to make is that if the railroads convinced this court that they were discriminated against, analyzing on a per-acre basis, and which requires comparison class, then it's the SNI's burden to prove that on a benefits basis the assessment was proportionate, and that was their burden. They failed to do that because the district court did not find that they did that. The district court simply said they attempted to do that, and furthermore, I would submit that they cannot prove it because our Daubert, the railroads' Daubert motion, should have been granted, and the SNI experts should not have been able to justify. And then the final point that I would make, and this court noted it in the Kohler opinion last time we were up here, is if, in fact, there's intentional discrimination, even justification will not overcome an intentional discrimination, and I think it's very clear this court's familiar with what happened last time. This is just a continuation of what happened the last time we were up here. It's intentional discrimination, and that would overcome even showing justification. Thank you, Your Honor. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.